IN THE SUPERIOR COURT
OF THE VIRGIN ISLANDS



**FILED**
July 31, 2025 12:51 PM
ST-2018-CV-00768
**TAMARA CHARLES**
**CLERK OF THE COURT**

## IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
### DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| **GREAT BAY CONDOMINIUM OWNERS ASSOCIATION, INC.,** | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | **CASE NO. ST-18-CV-768** |
| | ) | |
| v. | ) | Action for Declaratory |
| | ) | Judgment to Cancel Deed |
| | ) | and to Quiet Title |
| **THE NEIGHBORHOOD ASSOCIATION, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | Cite as 2025 VI Super 27 |

**W. MARK WILCZYNSKI, ESQ.**
Law Offices of W. Mark Wilczynski, P.C.
Palm Passage, Suite C20-22
P. O. Box 1150
St. Thomas, V. I. 00804-1150
*Attorneys for Plaintiff*

**MARIA TANKENSON HODGE, ESQ.**
Hodge & Hodge
1340 Taarneberg
St. Thomas, V.I. 00802
*Attorneys for Defendant*

**DAVID F. WENTZEL, ESQ.**
Wentzel Law Offices
77W. Washington St. Suite 2100
Chicago, Illinois 60602
*Attorneys for Plaintiff*

**MATTHEW A. HODGE, ESQ.**
Hodge & Hodge
1340 Taarneberg
St. Thomas, V.I. 00802
*Attorneys for Defendant*

**CARTY, Senior Sitting Judge**

### <u>MEMORANDUM OPINION</u>
**(Filed July 31, 2025)**

¶1    **BEFORE THIS COURT** is an action brought by Plaintiff Great Bay Condominium Owners Association, Inc. (hereinafter referred to as "Great Bay" or "GBCOA") seeking a declaratory judgment to cancel a deed and to quiet title to a

commercial condominium property, a concierge food and beverage lounge, located at The Ritz-Carlton Hotel premises in Estate Nazareth, St. Thomas, Virgin Islands. Great Bay seeks to cancel the deed tendered on September 20, 2017, by The Neighborhood Association, Inc. (hereinafter referred to as "NA") conveying title to the sole commercial unit ("CU-1") or the Suites Lounge.

¶2  This matter came on for bench trial in September 2023, at which time Great Bay contends the deed transferred on September 20, 2017, by Salvatore M. Cutrona, Sr. then-president of NA to Great Bay should be cancelled and deemed void because the transfer occurred in violation of the Bylaws of the GBCOA. A preliminary injunction hearing was conducted in November-December 2021, and the Plaintiff argued the covenants ran with the land and the two-bedroom suite owners were perpetually responsible for the maintenance and operation of CU-I, despite whomever owned CU-1. The Plaintiff has set forth the following primary arguments to support the cancellation of the deed:

1. CU-1 cannot be transferred without the consent and acceptance of Great Bay;
2. CU-1 cannot be transferred with outstanding obligations to include outstanding common charges, delinquent property taxes, or payments owed to contractors, and most importantly;
3. CU-1 cannot be transferred because the exclusive running covenants with the property dictate the owners of two-bedroom suites are obligated to maintain CU-1 in perpetuity.

¶3  The Plaintiff contends deed cancellation is appropriate because there were outstanding property taxes, unpaid assessments, restrictive covenants, and that

NA failed to finalize a contract with Great Bay. They contend CU-1 belongs only to NA members irrespective of who possesses title. To the contrary, the Defendant contends the deed recorded at the Office the Recorder of Deeds on March 6, 2018, transferring CU-1 was a valid deed because: 1.) the governing condominium documents, specifically the Fourth Amendment to the Declaration, grants NA authority to transfer CU-1 without the consent of Great Bay; and 2.) there were no outstanding assessments, financial obligations, or property taxes at the time of the conveyance, hence, Great Bay is the rightful owner of CU-1. There are several governing and organizational documents that are at the center of this dispute including the Condominium Declaration, Supplementary Declarations, Amendments, Articles of Incorporation, bylaws, and management agreements. Incorporated throughout this memorandum opinion are the findings of fact and conclusions of law.

I.    **The Associations- Background**

**A. Creation of Great Bay Condominium Owners Association, Inc.**

¶4    Marriott International, Inc. owns The Ritz-Carlton Hotel Company (hereinafter "The Ritz-Carlton"). Marriott International, Inc. and The Ritz-Carlton are a complex structure of hotels that constitute multiple subsidiaries and entities. RC Hotels (Virgin Islands), Inc. (formerly RC Hotels VI) is a corporation organized and existing under the laws of the U.S. Virgin Islands. The Ritz-Carlton is the Developer of the hotel and condominium property which is located on Parcel No. 6 at 6900 Great Bay, Estate Nazareth, St. Thomas, U. S. Virgin Islands.

¶5    On May 10, 2002, The Ritz-Carlton (also referred to as the "Declarant") established Great Bay Condominium Owners Association, Inc., through a Declaration of Condominium, pursuant to Chapter 33, Title 28 Virgin Islands Code, § 909 and recorded the Declaration in the Office of the Recorder of Deeds for the St. Thomas/St. John District on May 31, 2002. (*Ex. 79, Declaration Establishing a Plan for Condominium Ownership, May 10, 2002*), (hereinafter referred to as the "Condominium Act"). Great Bay is a not-for-profit club/condominium association established on March 2, 2000, through Articles of Incorporation, filed with the Office of the Recorder of Deeds. (*Ex. PI 5*)) This association was created for the specific purpose of managing and operating Great Bay condominium residence interests and the club at The Ritz-Carlton Hotel.[1] RC Hotel, St. Thomas, LLC (hereinafter "RC St. Thomas"), is one of several entities that falls under the umbrella of The Ritz-Carlton brand. Another layer in this complex structure of entities and subsidiaries is the Marriott Vacation Club Trust Owners Association (MVC TOA) which is a timeshare brand in the business of selling residence interests in the condominium units at The Ritz-Carlton Club. This Association operates as a separate entity but is associated with NA. The Ritz-Carlton has numerous luxury hotels and resorts in many states and countries and RC St. Thomas serves as the Management Company for the St.

---

[1] *See* Ex. PI 9 - Preliminary Injunction. The preliminary injunction hearing commenced on November 19, 2021, and continued through December 2021, on the sole issue of the propriety of common charges assessed to the members of NA for the maintenance of CU-1. On April 11, 2022, this Court issued a memorandum opinion in favor of NA enjoining Great Bay from collecting assessments, as a ruling on who owned CU-1 had not been decided. That decision is currently before the Supreme Court of the Virgin Islands.

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

*Cite as* 2025 VI Super 27

Thomas, Virgin Islands property which oversees the affairs of Great Bay and NA.[2]

¶6 This property consists of six (6) residential buildings - Buildings A, B, C, D, G, and H. The Declaration of Condominium granted all the privileges, restrictions, and conditions of the condominium units in the first four buildings: A, B, C, & D. Contemporaneously on the same date, May 10, 2002, the Supplementary Declaration of Condominium for the Club at Great Bay Condominium ("Supplementary Declaration" or "Club Declaration") was created. Buildings A-D were the first four buildings to be constructed, in phases, and submitted to the Government of the Virgin Islands which consist of two-bedroom residences and three-bedroom residences with full kitchens. Buildings A through D comprise a total of 80 units, with each unit having 12 deeded fractional interests. Thus, the total interests of this portion of Great Bay makes up 960 interests.

¶7 Buildings G and H, also known as the Gardenia and Heliconia buildings, are two-bedroom suites that were later constructed without kitchens or dining areas.[3] Buildings G and H are the focal point of this legal dispute. They have 12 units each and constitute 288 deeded fractional interests in these two buildings, which makes up The Neighborhood Association. Suite owners of NA are also members of the Great Bay Association. There are another 12 residence interests associated with CU-1 for a total of 1,260 members interest at The Ritz-Carlton property in St. Thomas, Virgin Islands.

---

[2] Trial Tr. Vol. 1, p. 92, September 11, 2023
[3] Trial Tr. Vol. 1, p. 112, September 11, 2023

¶8     In the ensuing years, several amendments were created and submitted to the government pursuant to the Condominium Act after the original Declaration was recorded on May 31, 2002. Those amendments were made to both the Declaration and the Supplementary Declaration. For each building that was submitted pursuant to the Condominium Act, under Title 28 V.I.C. § 901 *et seq.*, a supplementary declaration was submitted. (*Trial Tr. Vol. 1, p. 121, September 11, 2023*). The Supplementary Declaration subdivided the interests in the units of Buildings C and D and restated the ownership interests in the common areas. (*Trial Tr. Vol. 1, p. 144, September 11, 2023*).

¶9     The First and Second Amendments to the Declaration became effective and were recorded on July 5, 2002, and December 6, 2002, respectively. The Bylaws of Great Bay were submitted under the First Amendment to the Declaration and the Second Amendment submitted Building B. Further, the Third Amendment to the Declaration and Second Amendment to [the] Supplementary Declaration submitted Buildings C and D and divided the residence interests in those buildings, respectively.

¶10     The Fourth Amendment to the Declaration dated November 15, 2005, submitted the Heliconia building to the interval ownership in the Club. The Third Amendment to [the] Supplementary Declaration divided the interest and restated everyone's interest in the common areas of the residences of Building H.

¶11     On June 6, 2006, the Fifth Amendment to the Declaration conveyed the

Gardenia building, and *inter alia*, its land and the surrounding improvements, from The Ritz-Carlton to the interval ownership at Great Bay. Within this Fifth Amendment it was specified there are five floors, 12 residences, and one commercial unit located on the fifth floor. Article 19 of the Declaration is entitled: PHASED DEVELOPMENT, and pursuant to Article 19, section (a) "provides the Condominium may be developed in phases by Declarant or Declarant's successors and assigns." … "Subsequent phases may consist of additional Residences, commercial premises, parking, Common Elements, or some combination thereof." This Fifth Amendment submitted the floor plans of the Gardenia building under Phase Six; and, also detailed NA's ownership and responsibilities regarding CU-1. Contemporaneously, the Fourth Amendment to [the] Supplementary Declaration also pertains to Gardenia and describes the residences interests by weeks based on two calendars (timeshares) providing specificity of 12 residences and exclusive membership of two-bedroom suites.

¶12    Prior to the Fourth and Fifth Amendments, the Third Amendment to [the] Supplementary Declaration, which became effective on November 15, 2005, established NA as member of Great Bay and the amendment further subdivides the units of Building H into interests and restates everyone's interest in the common areas. Fractional residence interests were created in each condominium unit through the Supplementary Declaration in accordance with the provisions of Chapter 33, Virgin Islands Code, 28 V.I.C. § 901 *et seq.* The residence interests

are deeded fractional interests that provide each owner with twenty-one days of use on a rotating basis. The Fourth Amendment to [the] Supplementary Declaration was created on June 6, 2006. The Sixth Amendment to [the] Supplementary Declaration which became effective on November 14, 2011, authorized the right to rent interests that were 60 days or more in delinquency. To summarize these governing documents, The Ritz-Carlton established one Declaration, one Supplementary Declaration (also known as the "Club Declaration") and several amendments to both the Declaration and Supplementary Declaration (collectively referred to as the "Declarations") that were recorded with the Government of the Virgin Islands over several years.

### B. Creation of The Neighborhood Association, Inc.

¶13     On September 28, 2005, the Developer created The Neighborhood Association, Inc., a not-for-profit corporation, through the filing of Articles of Incorporation in the Office of the Lieutenant Governor, Office of the Recorder of Deeds. *[Ex. 7 p.1 Art. I]] (Trial Tr. Vol. 2, p. 198, September 12, 2023).* The Third Amendment to [the] Supplementary Declaration, which established NA, defined NA's responsibilities for CU-1. NA is a sub-group condominium association within Great Bay that represents 288 of the 1,260 members, therefore all members of NA are members of Great Bay by virtue of their ownership interest in a suite within the overall condominium complex. *[Trial Tr. Vol. 1, p. 91, September 11, 2023; Trial Tr. Vol 5, p. 72, September 15, 2023); Transcript of Hearing, (11/19/21) p.15. See also*

*2022 V.I. Super 41U Opinion, at para.6*]. NA consists of all two-bedroom suite owners in Buildings G and H.  NA members are the owners of fractional interests in the 24 suites with a right of occupancy for a period of 21 days on a rotating basis, commonly called timeshares. [*Transcript of Hearing, (11/19/21) p. 61).*

¶14    On December 20, 2008, after holding title to the only commercial unit on the premises for approximately 3 years, The Ritz-Carlton gave NA the condominium deed to CU-1.[4]  At the time of this transfer, CU-1 did not have a commercial kitchen, and neither was it designed to accommodate a large capacity of guests and members at a given time.  NA operated CU-1 from 2008 until 2013, as a concierge food and beverage outlet and was used solely for the use and enjoyment of NA members and occupants in the Gardenia and Heliconia suites.

## II.    **Procedural and Factual Background**

¶15    On December 5, 2018, Great Bay filed this action against NA in the Superior Court of the Virgin Islands alleging five causes of action: 1.) cancellation of a deed as void for failure to comply with the Declaration of Condominium – common elements restriction, 2.) cancellation of a deed as void for failure to comply with Declaration of Condominium–existing encumbrances; 3.) cancellation of a deed as void for failure to contract, 4.) to quiet title to commercial unit CU-1, and for a 5.) Declaratory Judgment. Simply put, Great Bay accuses NA of violating the governing condominium regulations and failing to consummate a contract for the

---

[4] Trial Tr. Vol. 2, pp. 203, 204, September 12, 2023

transfer of CU-1 to Great Bay. Within a year of filing the instant action, Great Bay filed a separate action before another judge of the Superior Court of the Virgin Islands, *Great Bay Condominium Owners Association, Inc. v. The Neighborhood Association, Inc.,* ST-2019-CV-00650, alleging four counts: 1.) unpaid assessments between 2017 through 2019, 2.) a claim for settlement funds from a 2012 lawsuit, a second 3.) claim for settlement funds resulting from the same lawsuit, and 4.) a claim to escrow funds in the minimum amount of $800,000 based on a Ratification Agreement entered into in May 2014.

¶16    Pursuant to the Virgin Islands Condominium Act, common charges are assessed annually upon all 1,260 member interests to maintain the upkeep of The Ritz-Carlton premises and cover other expenses associated with timeshares. During the pendency of this instant action to determine who owns CU-1, common area charges were assessed in this matter against NA in October 2021.[5]   To effectuate those particular assessments, Great Bay directly solicited the services of The Ritz-Carlton's third-party vendor, Concord Servicing Corporation (Concord) to issue common charges accrued between 2017 to 2021 to all 288 members of NA. The sum aggregate of the assessments was approximately $1,000,000, thus, each person was billed on average $3,400. NA objected to the assessments which resulted in the temporary restraining order entered on November 12, 2021. After a

---

[5] The term "common charges" is used to describe maintenance fees, assessments, or club dues. The last assessment for annual common charges assessed against NA as it pertains to CU-1 was done in 2016. The separate but related action in *Great Bay Condominium Owners Association, Inc. v. The Neighborhood Association, Inc.,* ST-2019-CV-00650, stems from dissemination of assessments for club years 2017 through 2019.

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

*Cite as* 2025 VI Super 27

hearing, a permanent injunction was entered on April 11, 2022. This Court found the assessments were improper while the action was pending because ownership of the CU-1 had not yet been determined.

¶17 At the injunction hearing, Great Bay relied heavily upon two servitudes that were created with CU-1 to support the proposition that the deed conveying CU-1 to NA warrants cancellation: 1.) there is a restrictive covenant limiting CU-1's exclusive use to occupants of the two-bedroom suites and 2.) there is an affirmative covenant obligating the owners of residence interests in the two-bedroom suites to pay all costs and expenses irrespective of ownership and operation of CU-1, including CU-1's share of the common annual maintenance expenses of the Condominium. Although CU-1 is a lounge for the common use of NA members and guests, CU-1 shares an interest of 1.1415112% in the common charges.[6]

¶18 Subsequently, the matter came for trial on the merits to determine the underlying issues of whether the conveyance of the deed to CU-1 was an *ultra vires* act and should be cancelled; and whether there were existing obligations that NA failed to satisfy at the time of the conveyance of the deed. During the September trial Great Bay presented an extensive amount of email communications between Great Bay's board members and NA's board members demonstrating numerous discussions dating as far back as April 8, 2015, reflecting Great Bay's desire to accept the deed to CU-1 and to become financially responsible for its operation and

---

[6] Trial Tr. Vol 1., p. 184, September 11, 2023; Trial Tr. Vol. 4, pp. 16-17, September 14, 2023.

maintenance, under certain conditions. NA maintained their position that the Fourth Amendment bestowed them with the authority to convey CU-1 to Great Bay without their need for acceptance.

### III.    **Legal Standard**

¶19   The first three counts of the Complaint seek the relief of cancelling the deed as void due to failure to comply with provisions of the Declaration; failure to resolve encumbrances; and failure to contract. Title 28 V.I.C. § 42 provides the formalities for executing a deed to be recognized in the Virgin Islands. It provides, (a) [d]eeds executed within the Virgin Islands of lands or any interest in lands therein shall be executed in the presence of two witnesses, who shall subscribe their names to the same as such; and the persons executing such deeds may acknowledge the execution thereof as provided in title 3 Virgin Islands Code, chapter 29. Section (b) states, [d]eeds executed in any State of the United States or in any foreign country may be executed according to the laws of such State or country and the execution thereof may be acknowledged as provided in title 3 Virgin Islands Code, chapter 29. *See also, Alexander v. Alexander,* 65 V.I. 372 (2016). Cancellation of a deed is an unusual exercise of judicial power. *Harris v. Lombardi,* 1990 V.I. Lexis 5, citing *Nieves v. Pitterson,* 19 V.I. 633 (D.V.I. 1983). In order to cancel a deed, the Plaintiff has to prove one of the following acts:1.) Grantor's signature was forged, or grantor was unaware of the nature of what is signed (void deed); or 2.) grantor was aware of what is executed, but was induced through fraudulent misrepresentations to

deliver the deed (voidable deed). *Schiavon v. Arnaudo Brothers* (2000) 4 Cal. App. 4th 374, 378; *Fallon v. Triangle Management Services* (1985) 169 Cal. App. 3d 1103, 1106; *Smith v. Williams* (1961) 55 Cal. 2d 617, 620; CC § 3412.) *Choi v. Heseon Park*, 2022 Cal. Super. LEXIS 21622, *7. The cancellation of a deed is an exertion of the most extraordinary power of a court of equity. The power ought not be exercised except in a clear and exceptional case. *Easterling v. Ferris ex rel. Okla. Tax Comm'n*, 1982 OK 99, P1, 651 P.2d 677, 679, 1982 Okla. LEXIS 259,*1 Cancellation of a deed is a matter of equitable cognizance. *Id.*

¶20 Great Bay has not argued forgery or the presence of fraudulent misrepresentation. Great Bay briefly raised a pre-trial argument of a disparity in signatures, which is not an element to be proven. They have not shown NA made fraudulent misrepresentations prior to delivering the deed making the deed voidable. They argued NA failed to comply with the restrictive covenants of the Declarations and those covenants are that NA has exclusive control over CU-1 and that NA suite owners are solely responsible for the financial matters of CU-1.

¶21 The Supreme Court of the Virgin Islands has held that a deed is a contract, and thus in most circumstances the principles of contract interpretation govern. *Estate Chocolate Hole Landowners' Ass'n v. Cenni*, 2024 VI 20. The Supreme Court has also held that a condominium association's by-laws and governing documents are to be construed "according to the general rules governing construction of statutes and contracts." *Weary v. Long Reef Condominium Association*, 57 V.I. 163,

170 (V.I. 2012) (citing *Singh v. Singh,* 9 Cal. Rptr. 3D 4, 27-28 (Cal. Ct. App. 2004). In this instance, there was no contract between the parties regarding the transfer of CU-1. Rather, Great Bay argues NA failed to consummate a contract, but because there is no contract and a deed was conveyed, the Court must refer to the governing and organizational documents of The Ritz-Carlton and both associations to determine the rights of the parties. The same legal standard for contracts applies to condominium declarations. "When the governing documents of condominium associations are clear and unambiguous, the Court must follow the plain meaning." *See Id. at 169.* "To determine whether a contract is ambiguous, we resort to principles of contract interpretation, keeping in mind that our primary purpose is to ascertain and give effect to the parties' objective intent." *Phillip v. Marsh-Monsanto,* 66 V.I. 612, 624 (V.I. 2017). The Court is restricted to the Declaration, Supplementary Declaration, Amendments, and governing statutes and documents.

¶22 The Virgin Islands Condominium Act codified in Title 28 of the Virgin Islands Code governs all condominium owners. Section 905(a) provides: [e]ach apartment owner shall be entitled to an undivided interest in the common areas and facilities in the percentage expressed in the Declaration. Such percentage shall be computed by taking as a basis the value of the apartment in relation to the value of the property. In addition, section 909 provides the common profits of the property shall be distributed among, and the common expenses shall be charged to the

apartment owners according to the percentage of the undivided interest in the common areas and facilities.

## Discussion

### A. Findings of Fact

¶23    On May 22, 2002, The Ritz-Carlton through RC Hotel (Virgin Islands)[7], the Management Company, entered into a management agreement with Great Bay. There were several amended agreements over a period of time to include the Amended and Restated Agreement of July 8, 2019.[8] The agreement states, "[t]his Association is the corporate entity created to operate the common elements of the Great Bay Condominium pursuant to the Declarations."[9] "The Management Company was employed by the Association to act on its behalf and on behalf of its members as the exclusive managing entity to manage the daily affairs of the condominium."[10]

¶24    On December 15, 2005, the Management Company, entered into a similar management agreement with NA.[11]   The management agreement states, "[t]his Association is the corporate entity created to operate and own or lease, that certain commercial unit located in Building G to be used initially as a food and

---

[7] During November 2011, RC Hotels (Virgin Islands), Inc. assigned its duties to RC ST. Thomas, LLC, pursuant to an assignment executed between the entities.

[8] *See* Ex. 78. The Management Company was also referred to as the Operating Company or onsite operator. Trial Tr. Vol. 3, p. 306, September 13, 2023.

[9] *Id.*

[10] *Id.* The Agreement further states …"the Management Company shall be acting on behalf of the Association, and nothing in this Agreement shall be construed as creating a partnership, joint venture, or any other relationship between the parties to this Agreement."

[11] *See* Ex. B.

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

*Cite as* 2025 VI Super 27

beverage dining lounge for the Members of the Association and other invitees pursuant to the Declarations." The management agreement also incorporated NA's Articles of Incorporation, and other governing documents which all explain that NA was created for the sole purpose of administering the purposes and objects of the Association to supervise, direct and control the management and operation of the Association, the lounge, and any other Association property and to manage the daily affairs of the Association and Association property exclusively.[12] Thus, the Management Company acts on behalf of both NA and Great Bay. (*Trial Tr. Vol. 3, p. 297, September 13, 2023*).

¶25  One of the many functions the Management Company undertakes for both associations is the preparation of an annual budget every Club Year. The Ritz-Carlton Hotels (Virgin Islands) employs several individuals including the Director of Finance, Marsha Leighton-Herrmann, who is primarily responsible for drafting the budgets, presenting those draft budgets to the respective board of directors, modifying budgets, and preparing them for board approval.[13] Great Bay's Board of Directors convenes approximately four times per year, and the budgets are generally approved the summer before the Club Year commences, which covers the period from November to October of the following calendar year. Board meetings are conducted over two consecutive days. During Club Year 2017, the Board met on August 3-4, 2016, and again on November 7-8, 2016. The Club Year covered

---

[12] *See* Ex. B.
[13] Trial Tr. Vol. 3, pp. 303, 306, September 13, 2023.

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

Cite as 2025 VI Super 27

the period between November 2016 through October 2017, and the Board approved, *inter alia*, the following assessments/maintenance fees for residences:

> $12,348.55 for a 2-bedroom unit in Bldgs. A-D
>
> $14,520.52 for a 3-bedroom unit in Bldgs. A-D
>
> $11,786.54 for 2-bedroom suite owners in Bldgs. G and H

The fees remained the same in 2018. (*Ex. 12*) (*Ex. 6-2*; See also, *Trial Tr. Vol. 2, pp. 138-139, September 12, 2023)*

¶26    Mr. Christopher Martin, the Director of Finance and Accounting of Marriott Vacations Worldwide Corporation, testified that after Marsha Leighton-Herrmann completes the draft budgets and they are approved by the respective Board of Directors, his responsibility is to make sure The Ritz-Carlton Club budgets are invoiced, assessed, and collected through their third-party vendor, Concord. (*Trial Tr. Vol. 3, p. 177, September 13, 2023)*. This task includes budgets for both Great Bay and NA. *Id. at 178.*

¶27 Each budget is independently discussed, analyzed, and approved.  Great Bay, as the larger association of the two, carried a robust all-inclusive budget that was $16,962,184 in 2017, while in 2016, NA's budget was $713, 955.19.[14] Since Great Bay represents the interests of all condominium owners of all units and interval interests, their budget is considerably larger than NA's. (*Trial Tr.  Vol. 1, p. 91, September 11, 2023); (Trial Tr. Vol. 5, p. 75, September 15, 2023) See also Opinion, 2022 V.I. Super 41U, at para.6].*   In Great Bay's 2017 approved budget there is a

---

[14] Trial Tr. Vol. 3, p, 370, September 13, 2023; Ex. 64

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

*Cite as* 2025 VI Super 27

column entitled "Commercial unit CU-1" which reflects $159,083.06.[15] A review of NA's budget would reflect a similar line item for CU-1 that shows the charge for CU-1 and there is a line item named "Great Bay Condo allocation" therefore the amount charged for CU-1 in Great Bay's budget also appears in NA's budget. (*Trial Tr. Vol. 3, pp.182, 183, September 13, 2023*).

¶28   The charge for CU-1 is assessed against each of the 288 members of NA. (*Id. at 183*). This special charge for CU-1 is in addition to their standard annual club assessments.

¶29   Concord disseminates invoices, cover letters, and other forms of communication to the members and collects and deposits funds. The funds are placed in the appropriate accounts depending upon whether the monies are to be directed to Great Bay or to NA bank accounts. (*Trial Tr. Vol. 3, p. 180, September 13, 2023*). Concord disseminates the invoices each October with a 30-day period to pay and a 10-day grace period before a late fee is assessed. Invoices are sent out to the members in October to ensure fees are paid prior to the start of the Club Year and all members are required to pay their proportionate share of fees. The goal is to get the invoices out by the first week of October.[16] Fees are paid in advance of Thanksgiving and Christmas season to ensure members do not use the Club amenities without paying.  All fees that are collected are recorded as a journal entry, therefore NA's payment to Great Bay shows up as a journal entry at the

---

[15] Ex. 6-1
[16] Trial Tr. Vol. 3, p. 227, September 13, 2023

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

Cite as 2025 VI Super 27

beginning of the year in Great Bay's books. This process of assessing and collecting fees is done by the Management Company by placing journal entries in the books in January of the club year for the amount that was approved at the budget meetings. (*Trial Tr. Vol. 2, pp. 16, 18, September 12, 2023*). These fees are approved within the budget, which are paid directly to The Ritz-Carlton from the suite owners through NA. (*Trial Tr. Vol. 2, p. 16, September 12, 2023*) Within the budget, there are appropriations for operating expenses, reserves, contingencies, maintenance fees, CU-1, and other expenses. However, in January 2017, no journal entry had been made in favor of Great Bay. (*Trial Tr. Vol. 2, p. 20, September 12, 2023*).

### i. Conveyance of the CU-1 Deed

¶30    In 2010, Salvatore M. Cutrona, Sr. ("Cutrona") was selected to serve as president of NA. Prior to serving on the NA Board, he served for approximately six (6) years on the Great Bay board. CU-1 was built in 2006 on the fifth floor of the Gardenia building, and when it was constructed, it did not meet the Virgin Islands building code specifications. However, in 2013 NA renovated and upgraded CU-1 and brought it into compliance with the building code. After an extensive amount of failed negotiations, on September 20, 2017, NA conveyed CU-1 to Great Bay. Cutrona testified he created five sets of an original of the deed and distributed them accordingly: a copy sent to Abigail Chung, then-vice president of Great Bay; a copy sent to John Doyle, then-president of Great Bay; a copy sent to NA's counsel, a copy sent to Marc Betesh, NA's secretary; and copy retained by Cutrona for his

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

*Cite as* 2025 VI Super 27

records.[17] The deed was transferred the same day that the second storm, Hurricane Maria, struck the U. S. Virgin Islands. However, NA recorded the deed on March 6, 2018, immediately after the property taxes were paid. Great Bay fleetingly questioned the authenticity of the deed claiming there can only be one original. Cutrona testified he created duplicate copies, containing identical language.[18]

¶31 Title 28 Virgin Islands Code § 132 provides: [t]he record of any document in the Office of the Recorder of Deeds, *or a copy of such record*, shall be admissible in evidence in any court in the Virgin Islands. Similarly, in the context of a duplicate deed, the federal rules of evidence provide: "a duplicate is admissible in the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original, or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original. *Enfield Green Homeowners Ass'n v. Francis* 340 F. Supp. 2d 590, 594 n. 6 (D.V.I. 2004). There is no issue regarding the authenticity of the deed as the five duplicates were actually delivered to all pertinent parties at the same time. With the exception of a slight insignificant difference in the signatures, the material terms of the deed(s) are all the same. The deed was not recorded in the Office of the Recorder of Deeds until March 6, 2018, when the Government of the Virgin Islands re-opened to conduct business.

---

[17] Preliminary Injunction hearing Trans. Dec. 13, 2021, p.83
[18] Preliminary Injunction hearing Trans. Dec.13, 2021, pp. 82, 83, 84.

¶32    On November 2, 2017, over one month and ten days after the deed was conveyed, Abigail Chung, vice-president of Great Bay, transmitted the first communication rejecting the deed on the basis that settlement funds, as demanded, were not tendered with the deed therefore they cannot accept the deed. On November 11, 2017, NA, through counsel, advised Ms. Chung that the conveyance of the deed was done in accordance with the applicable provisions of the condominium declaration. NA tendered the deed without conditions based on their reliance on the governing documents of both associations and pertinent amendments to the Declaration which grant NA authority to convey. Further, the correspondence also explained that the conveyance was done with the majority members of NA voting in favor of granting the CU-1 deed to Great Bay.[19]

### ii.    Declaration, Supplementary Declarations, and Amendments

¶33    The Declaration is the instrument by which The Ritz-Carlton properties were submitted to the provisions of Chapter 33, Title 28, under the Virgin Islands Condominium Act, ... and such declaration as from time to time may be lawfully amended.[20] On May 10, 2002, The Ritz-Carlton signed the Declaration establishing Great Bay and also established the Supplementary Declaration. NA relies heavily on the Declaration and in particular its Fourth Amendment to support their

---

[19] Ex. 7-1, Trial Tr. Vol. 2, pp. 231, 232, 313, September 12, 2023, the final vote on the deed transfer to GBCOA (conducted on October 30, 2016) was 80.9% in favor of deed transfer. Twenty percent (20%) either did not vote or voted no. It is noteworthy to highlight the MVC TOA which owns approximately half of the 288 interests (141) chose not to vote and decided to remain neutral. This is an indication that the MVC TOA an entity affiliated with The Ritz-Carlton took no side in this dispute and did not want to become involved. This vote also excluded delinquent suite owners.
[20] Ex. 79

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

*Cite as* 2025 VI Super 27

contention that the deed was properly conveyed to Great Bay and should not be canceled.

¶34 The most relevant amendments to this discussion both established on November 15, 2005, are the Third Amendment to [the] Supplementary Declaration and the Fourth Amendment to the Declaration. (*Ex.10, Ex. F, Ex. PI E*) which both amendments created NA and the plan for NA to be the initial owner of the commercial unit, designated CU-1. [*See also 2022 VI Super 41U Opinion*, ¶8]. Although CU-1 was established in 2005 but constructed in 2006, title remained with the Developer until it was transferred to NA in 2008.

¶35 The Third Amendment to [the] Supplementary Declaration established NA as a member of Great Bay and further proscribed NA's responsibilities particularly as it pertains to CU-1. Paragraph 4 of the Third Amendment provides, in its pertinent portion:

> The twelve (12) Residences which are the subject of this amendment are Two Bedroom Suites and, as such, all Owners of Residence Interests therein shall in addition to being members of the Condominium Association, be mandatory members of the Neighborhood Association whose contemplated sole purpose shall be to own and operate Commercial Unit CU-1, and which may provide certain services for the exclusive benefit of the occupants from time to time of the Two Bedroom Suites, whether or not such occupants are Members of the Neighborhood Association. <u>More particularly, and in accordance with the separate organizational and governing documents of the Neighborhood Association, its members shall control the Neighborhood Association and be responsible for all costs and expenses related to the ownership and operation of the Commercial Unit, **owned by it**, including but not limited to any services that it may elect to provide.</u>"

¶36 With the exception of "**owned by it**" the language of this Third Amendment is identical to the language of the Fourth Amendment. This language unequivocally

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

*Cite as* 2025 VI Super 27

demonstrates to the Court the Declarant's intent to create NA as a part of Great Bay, as all members of NA are mandatory members of Great Bay and NA was created for the sole purpose to own and operate CU-1. Assessments attributed to this sole commercial unit lay full financial responsibility with NA members. However, NA's governance is not limited to the four corners of the amendments. The Plaintiff has overlooked the provisions of the Third Amendment which specifically reference inclusion of NA's organizational and governing documents, such as the Bylaws. NA's Bylaws provide: "for the powers of the Board which gives the Board the authority to "purchase, lease or accept conveyance of the Lounge without the vote of the Members and **convey property**, as well as the power to make and collect all assessments and use and expend said assessments of the Association and is responsible for carrying out the affairs of the Association." Inherent in ownership is the authority to convey, transfer, or discard. The Court can reasonably conclude that if NA's Bylaws grant them the authority to convey CU-1, they no longer own it once it is conveyed. A conveyance automatically extinguishes the responsibility for payment of the annual assessments.

¶37    CU-1 was meant to provide the owner/members in the 288 fractional interests with an amenity in place of the kitchens that other units in the Great Bay Condominium had, but that the suites within the NA ownership group then lacked. (*Trial Tr. Vol. 1, p. 120, September 11, 2023; See also Opinion, at para. 9*]. The Fourth Amendment to the Declaration follows up on the Third Amendment to [the]

Supplementary Declaration and specifically provides for a conveyance of CU-1.

Section 5, paragraph 5 of the Fourth Amendment provides in its respective part:

> <u>The Declarant or an Owner of a Commercial Unit may also convey a Commercial Unit, or any subdivision thereof in the case of Declarant, to the Association for no or nominal consideration without the consent of any other Owner or the Association, and *the Association shall be obligated to accept conveyance.*</u>" A Commercial Unit will only be transferred to the Association free of service contracts or other obligations other than as provided in the Declaration, By-laws and Rules and Regulations, all as amended from time to time.

¶38  The language in both amendments is unambiguous.  The Third Amendment to [the] Supplementary Declaration provides for a conveyance by incorporating NA's Bylaws and the Fourth Amendment directly provides for conveyance.  The Fourth Amendment explains that besides RC Hotels (Virgin Islands), NA, as the owner of CU-1 may convey CU-1 to the Association.  There are only two associations on the premises,[21] therefore, the logical interpretation is that NA can convey CU-1 to Great Bay for no or nominal consideration without the consent of Great Bay and Great Bay shall be obligated to accept conveyance.  There is no single person or group of people within the NA that is permitted to own a commercial unit.  CU-1 was owned by all 288 members of NA.

¶39  Now, Great Bay has put forth several arguments. They contend the language should be interpreted as Declarant – RC Hotels -- conveying CU-1 to

---

[21] The MVC TOA is a trust association on the premises which is a subsidiary of Marriott Vacations Worldwide unlike the GBCOA and NA. (*See Trial Tr. Vol. 4, p. 388, September 14, 2023*).

the NA and not the NA to Great Bay because at the time of the offering of the Fourth Amendment under the Virgin Islands Condominium Act, CU-1 was not in existence. Thus, the Fourth Amendment was written in anticipation of the future creation of CU-1. They rely on the following section 6, to argue that the Fourth Amendment anticipated the construction of CU-1 which had not yet been built in 2005, and further, that the Declarant intended the Fifth Amendment to supersede the Fourth Amendment. Section 6 provides:

> All Owners of Residences that are designated as a Two Bedroom Suite in Phase 5 or Phase 6 shall, in addition to being Members of the Condominium Association, be mandatory members of the Neighborhood Association whose contemplated sole initial purpose shall be to own and operate Commercial Unit CU-1, **anticipated to be created in Phase 6**, and which may provide certain food and beverage services for the exclusive benefit of the occupants from time to time of the Two Bedroom Suites, whether or not such occupants are Members of the Neighborhood Association. More particularly, and in accordance with the separate organizational and governing documents of the Neighborhood Association, its members shall control the Neighborhood Association and be responsible for all costs and expenses related to the ownership, maintenance and operation of Commercial Unit **owned by it**, including but not limited to any services that it may elect to provide.

This argument is unsubstantiated and unconvincing, because the physical structure of CU-1 did not have to exist to determine how it should be operated once it was constructed. Furthermore, the language "owned by it" is significant because all conditions apply to NA only if the commercial unit is owned by NA. Once property is conveyed, it is no longer owned by the grantor.

¶40   When Building G, which houses CU-1, was submitted to the government on June 6, 2006, under the Fifth Amendment, it was 8 months after the Fourth

Amendment was created. This is indicative of Declarant's intent that when the Fourth Amendment was established, the anticipation of erecting CU-1 was imminent and the Fourth Amendment served as the genesis or a precursor to the Fifth Amendment. Pursuant to Article 19 of the Declaration, the Fifth Amendment established on June 6, 2006, states in the first paragraph:

> The Declaration is hereby amended to submit the land described in exhibit A...together with Building G and related improvements thereon erected, owned by the Declarant in fee simple absolute **(hereinafter, separately sometimes referred to as Phase Six property, but together with the previously submitted land and improvements, collectively referred to as the "Property"),** to provisions of Chapter 33 Title 28, Virgin Islands Code, known also as the Condominium Act of the Virgin Islands.

The fifth paragraph provides:

> All Owners of Residences that are designated as a Two Bedroom Suite shall, in addition to being members of the Condominium Association, be mandatory members of the Neighborhood Association whose sole purpose is to own and operate Commercial Unit CU-1, which shall be conveyed by Declarant to the Neighborhood Association and utilized for the exclusive benefit of the occupants from time to time of the Two Bedroom Suites, whether or not such occupants are Members of the Neighborhood Association, and as more particularly described in the organizational and governing documents of the Neighborhood Association. As a member of the Neighborhood Association, Owners of Two Bedroom Suites are responsible for all costs and expenses of the ownership and operation of Commercial Unit CU-1, including but not limited to any services that it may elect to provide.

¶41 On the same day, June 6, 2006, the Fourth Amendment to [the] Supplementary Declaration was submitted to the government. The pertinent portions are under paragraph 5 and read as follows:

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

Cite as 2025 VI Super 27

> The twelve (12) Residences which are the subject of this amendment are Two Bedroom Suites and, as such, all Owners of Residence Interests therein shall in addition to being Members of the Condominium Association, be mandatory members of the Neighborhood Association, whose contemplated sole purpose shall be to own and operate Commercial Unit CU-1, and which may provide certain services for the exclusive benefit of the occupants from time to time of the Two Bedroom Suites, whether or not such occupants are Members of the Neighborhood Association. More particularly, and in accordance with the separate organizational and governing documents of the Neighborhood Association, its members shall control the Neighborhood Association and be responsible for all costs and expenses related to the ownership and operation of the Commercial Unit CU-1, including but not limited to any services that it may elect to provide.

¶42 This language is effectively the same as the Fifth Amendment *supra*. The only distinction is that the Fourth Amendment to [the] Supplementary Declaration specifies the number of residences in Building G, i.e. 12. There is no express or implied language in the Fifth Amendment to suggest, much less conclude, that it superseded the Fourth Amendment. Also, to argue that the Fifth Amendment superseded the Fourth also means that the Fourth Amendment to [the] Supplementary Declaration also dated June 6, 2006, superseded the Fourth Amendment to the Declaration. This is unlikely the Declarant's intent.

¶43 Moreover, Great Bay has overlooked the concluding language in both the Fourth and Fifth Amendments under paragraphs 8 and 6, respectively, which states: "[i]n all other aspects the Declaration remains unchanged, and all provisions relating to the Property now apply to the Property which by this

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

Cite as 2025 VI Super 27

amendment has become part of the Condominium.[22] Likewise, the Fourth Amendment to the Supplementary Declaration provides similar language under paragraph 7 to include Phase 6. Hence, the Fifth Amendment did not extinguish the Fourth, rather it serves as a follow-up to the Fourth. Additionally, the first paragraph provides that Building G is added to the previously submitted land, thus it demonstrates the Declarant's intent was to develop the next phase. Therefore, a reading of all the amendments which reveals a reiteration of the same representations throughout with additional provisions, none of which materially modify or extinguish the former provisions, demonstrates that the Fifth Amendment was not intended to supersede the Fourth Amendment but meant to supplement and further clarify the Fourth Amendment. Great Bay's proposition of a conflict between the pertinent portions of sections 5 and 6 of the Fourth Amendment which reflects that section 6 provides more specific language than section 5, is incorrect. They argue NA has completely misconstrued sections 5 and 6 because the two restrictive covenants under the Fifth Amendment as set forth by Great Bay are: 1.) limitation of use of CU-1 to owners (and guests) of 2-bedroom suites and 2.) responsibility of NA to pay the assessments.

¶44 While the Declaration is unambiguous regarding those two restrictions and Great Bay is correct on those two restrictions, they overlook the provisions within the same Declaration that allow for the conveyance without consent. The Third

---

[22] Paragraph 8: "In all other aspects the Declaration remains unchanged, and all provisions relating to the Property now apply to the Property which by this Fourth Amendment has become part of the Condominium.

Amendment introduced the Neighborhood Association and then the Fourth Amendment revealed the Developer's plan to create CU-1. Before the completion of CU-1, the parties were made aware of NA's responsibilities as it pertains to the upkeep and operation of CU-1. Both associations were placed on notice that any future conveyance to the (Great Bay) Association had to be free of service contracts and clear of any obligations; and the Fourth Amendment further provided guidance as to the authority to convey CU-1 and the manner that a conveyance would be proper and consistent with the terms of the Declaration. The Court does not view the language between sections 5 and 6 of the Fourth Amendment as "specific" versus to "general", neither does it view the Fifth Amendment as superseding the Fourth Amendment. The history of the condominium complex shows it was developed in phases and for each phase, the developer contemporaneously recorded two instruments:

> (1) a Declaration or amendment thereto submitting a specific building containing residences to the condominium form of ownership in accordance with the Condominium Act; and

> (2) a Supplementary Declaration or amendment thereto dividing each of the residence the building or buildings as applicable into twelve "Residence Interests" each an alienable real property estate submitted to the condominium for ownership in accordance with the Condominium Act.

¶45    Because The Ritz-Carlton was developed in phases, each phase added another layer to the condominium complex, not extinguished a prior amendment as Great Bay would argue. The Fifth Amendment, in plain meaning, does two

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

Cite as 2025 VI Super 27

main things: it adds Building G, and by virtue of the fact that CU-1 is located on the 5th floor of Building G, it adds CU-1. Second, it reiterates NA's purpose as it relates to the creation and operation of CU-1.

¶46 Now, in spite of the many iterations under the Fourth Amendment and NA's Bylaws that NA, as the Owner, has the right to convey CU-1 free of obligations, Great Bay, after the deed was transferred to them, took full control and declined NA access to CU-1. (*Trial Tr. Vol. 2, pp. 84, 85, September 12, 2023*). Great Bay wrongfully excluded NA from the use of CU-1, primarily because NA did not honor Great Bay's demands. Great Bay intentionally excluded NA in response to what they believed to be an *ultra vires* act, however, the conveyance was not done in contravention to the Declaration or Supplementary Declaration, but done in accordance with the Declarant's Fourth Amendment and NA's own Bylaws.

¶47 In addition to the authority granted upon an owner of a commercial unit to convey such a unit without consent, Great Bay was the first association, therefore the primary association that can be the recipient of CU-1. Although the Bylaws of both associations refer to each as the "Association" each association was created for a different purpose. As previously stated, NA was created solely to administer the affairs of CU-1. On the other hand, one of Great Bay's purpose is "to promote the general welfare of the Association and its Members and to enforce the provisions of the Declaration and Bylaws and Rules and Regulations of Great Bay Condominium as the same may be amended from time to time." (*See Articles of Incorporation, Great Bay*). NA, the secondary association is a subset of Great Bay.

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

*Cite as* 2025 VI Super 27

NA exists out of Great Bay, so when the term "association" was first used it referred to Great Bay. The Declarant unambiguously stated NA was created only for the purpose of owning and managing CU-1, wherefore, Great Bay is the corporate entity responsible for all other aspects of the club. Great Bay has not shown the interpretation of the term "Association" meaning - Great Bay - is incorrect as a rational factfinder can construe the term "Association" under the Fourth Amendment means an organization other than NA. Under section (l) of the Bylaws, NA may "acquire, hold, lease, mortgage and convey property including but not limited to Commercial Units in the Condominium ... on behalf of the Association."[23]

### iii.   CU-1/Grand Palazzo Club

¶48   When CU-1 was built in 2006, it was built as a residential floor and not to Virgin Islands building code specifications for assembly usage.[24] At some point as NA was in the planning stages of refurbishing CU-1 to improve the accommodations, a lawsuit against The Ritz-Carlton and others was brought as a result of discovering code violations.[25] The matter was settled and after receiving the settlement funds from the lawsuit, NA undertook the task of refurbishing CU-1 from the suites lounge to a restaurant and bar. Customarily, food would be

---

[23] *See* Ex. 80, section (l).
[24] Trans. September 12, 2023, pp. 201, 202
[25] Ex. 17, NA's annual Board of Director's Minutes dated December 6, 2015. *The Neighborhood Association, Inc. et al. v. Miller Legg, & Associates et al.,* ST-2012-CV-00024

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

Cite *as* 2025 VI Super 27

prepared and delivered to the lounge for sale exclusively for the benefit of NA members and their guests. However, new construction afforded the creation of a commercial kitchen, expansion of the single restroom to two restrooms, expansion and enclosure of the balcony to accommodate more guests, installation of windows, installation of a new air conditioning system and other major repairs were completed converting the CU-1 lounge to the Grand Palazzo Club (GPC).

¶49   The GPC was opened with a celebration on December 13, 2013, and for the entire year of 2014 NA controlled all operations of the GPC.  In 2015, NA began the process of negotiating with Great Bay primarily through the president, John Doyle.  Cutrona testified that after the refurbishment of the GPC was completed in 2013, it was NA's intent to open the GPC to all 1, 260 members of Great Bay. *(Trial Tr. Vol. 5, p. 75, September 15, 2023)*.  To that end, on August 8, 2013, Great Bay and NA entered the first of three successive annual residence owners' agreements to provide Great Bay with the same food and beverage privileges as NA. This agreement provides in part:

> WHEREAS,   owners   of   two   and   three   bedroom   Residence Interests...inclusive at Great Bay Condominium ("Residence Owners") are not members of NA and are not entitled to food and beverage service on the Fifth Floor Lounge; and

> WHEREAS, GBCOA and NA agree that it is in the best interest of the Homeowners Association and the commercial unit association to extend membership privileges at the Fifth Floor to Residence Owners pursuant to the terms and conditions of this Agreement set out herein; and ...

¶50   These agreements are important because Great Bay's first cause of action in

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

*Cite as* 2025 VI Super 27

their Complaint seeks relief from this Court to enforce a covenant that the servitudes are not extinguished by the transfer of CU-1 to Great Bay, but rather that CU-1 remains inextricably linked to two-bedroom suite owners. They claim NA violated the Declaration. As per the restrictive covenant limiting use of CU-1 to NA and its guests, Great Bay broke that covenant in 2013 when they executed the first of three Residence Owners agreements with NA to use CU-1. These agreements, not authorized by the Declarations, allowed Great Bay members to have access to CU-1 and its amenities, for a fee, and modified the payment of CU-1 assessments. The First Amendment was entered on November 1, 2014, which allowed Great Bay members to have a 15% discount on menu prices for meals and beverages services, and to also access wines storage lockers without charge. NA also agreed to pay Great Bay a monthly aggregate equal to 15% of the charges incurred by the members and their guests during the month for all meals and beverage services. The Second Amendment was entered on November 1, 2015, and reduced the discount to 10% and charged Great Bay members the same rate for breakfast as it would charge NA members. (*Exs. 15-17, See also, Transcript of Hearing pp. 23, 24; (November 19, 2021); (Trial Tr. Vol. 1, p. 152, September 11, 2023).* It further modified the agreement where Great Bay, as the Association, would pay an annual fee for access to the lounge in an amount equal to half of the annual dues obligation of NA to Great Bay for CU-1.

¶51 Great Bay paid NA approximately $160,000 for access to the GPC which represented NA's share of the common charges for CU-1. These actions of NA and

Great Bay entering into these residence owners agreements coupled with extensive negotiations, are an indication to the Court of Great Bay's intent to negotiate the ownership of CU-1 and to assume the full financial responsibility of CU-1, thus negating the argument that NA was exclusively financially responsible irrespective of who owns CU-1.

¶52 Great Bay argues the act of conveying the deed upon them is *ultra vires* because there were outstanding obligations. First, Great Bay claims NA's retention of the reserves is an obligation under the Fourth Amendment of the Declaration. The Court disagrees. Each year within each association's budget, funds are set aside in a component called replacement reserve account. (*Trial Tr. Vol. 3, p. 188, September 13, 2023*). The reserves for replacement is money that is collected today to be used for the repair and replacement of association property in the future. (*Trial Tr. Vol. 3, p. 189, September 13, 2023; Trial Tr. Vol. 1, p.181, September 11, 2023*). NA's budgeted reserve for replacement for refurbishment at the GPC for Club Year 2017 was $12,363.63. (*Trial Tr. Vol. 1, p. 181, September 11, 2023; Ex.5, p.38*). Armstrong Consulting, Inc. is a company contracted by the Management Company that conducts regular studies to determine the lifespan and usefulness of furniture and furnishings and recommends when and what furnishings should be replaced.

¶53 The reserves are exactly that, reserves. Within NA's budget, which is created by the Management Company and approved by NA, they set aside additional funds every year separate and apart for operating expenses and other expenses for the

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

*Cite as* 2025 VI Super 27

purpose of replacing furniture. Those reserves are accumulated over a period of time. Great Bay also has reserves that are set aside in their budget. Because reserves are budgeted and saved they cannot be categorized as an obligation. The Court recognizes that if NA is setting aside funds for the refurbishment of the GPC and NA no longer owns it, there is no need to maintain a reserve. However, the Court views that the Fourth Amendment only speaks to obligations that will create a future financial obligation for Great Bay. In other words, CU-1 can only be conveyed debt-free or without any ongoing contractual or legal ties to third parties. A reserve is not a debt, it's an asset. Notably, because it accumulates every year CU-1's total reserves were in the amount of $159,000 at the time of the deed transfer while Great Bay's reserves in 2018 exceeded $3 million.[26] Because negotiations failed on the issue of the reserves, the Court can not conclude that failed negotiations resulted in an existing obligation that voids the deed.

¶54    The next argument Great Bay puts forth refers to NA having the perpetual obligation to pay for the maintenance fees of CU-1 whether they own it or not. At the time of the conveyance, no fees were assessed to NA because the parties were having discussions for several months and had determined by motion, and seconded and approved at the 2016 budget meeting, that the Management Company would not assess approximately $160,000 in maintenance fees for Club Year 2017. This decision was made in anticipation of successfully negotiating a

---

[26] Ex. 5, p. 18

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

*Cite as* 2025 VI Super 27

deed transfer agreement and Great Bay had intended to assume the financial burden of operating and maintaining CU-1. Therefore, there were no assessments against NA for CU-1, at the time of the transfer of the deed.

¶55　They further argued there were outstanding property taxes as another obligation that NA failed to meet. Until December 2008, The Ritz-Carlton paid the property taxes until they deeded CU-1 to NA. CU-1 is not a stand-alone structure but, as previously stated, is situated on the fifth floor of the Gardenia residences. Pursuant to Title 33 V.I.C. § 2495-Demand for Tax, "[t]he Tax Assessor's Office shall send notices of payment due to all property holders in the Virgin Islands, by certified mail, to their last known mailing address before June 30th of each year. The Tax Assessor shall include in the notices the amount of any unpaid delinquent taxes and public sewer user fees past due at the time of the notice and the information contained in general notice set forth in section 2496."

¶56　Under § 2403, [t]he Tax Assessor, in making the assessment or in revising existing assessments, shall list each piece or parcel of real estate separately, and give to each its assessed value, together with a description of the parcel and the name and address of the owner, insofar as such information can be obtained. Where real property embraces both land and improvements, the assessed value of the land and of the improvements shall be given separately.[27]

¶57　In this case, a tax bill was never generated and issued to NA because the

---

[27] Title 33 V.I.C. § 2403

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

Cite as 2025 VI Super 27

government never recognized CU-1 as a separate piece or parcel of real estate. Prior to 2018, NA did not pay a property tax on CU-1 despite owning and operating it for several years. There was no testimony presented showing The Ritz-Carlton demanded payment from NA for the property tax, but the Management Company reimbursed Cutrona after he used personal funds to pay the tax. (*Trial Tr. Vol. 4, pp.191-193, September 14, 2023*).

¶58 "Every person owning property liable to taxation under this subtitle which has not been assessed for taxation, or which has escaped assessment or taxation for any year, shall report same to the assessor."[28] While it is the responsibility of the property owner to notify the tax assessor of an escape from assessment, NA could not have known of an assessment because the government never designated a parcel number separately identifying CU-1 from the premises of The Ritz-Carlton. Hence, from 2008 to 2017, a separate bill was never generated for CU-1. NA, aware that a tax clearance letter is necessary prior to recording a deed, diligently sought assistance from the Management Company officials, Stephanie Sobeck (Vice-President of Asset Management) and Marsha Leighton-Herrmann. The Management Company officials inquired regarding the taxes but were unable to secure an answer from the Government of the Virgin Islands. Sobeck testified they had not received a tax bill and found out that up until 2008, CU-1 was not set up as a separate parcel. (*Trial Tr. Vol. 4, p. 313, September 14, 2023*). Sobeck

---

[28] Title 33 V.I.C. § 2411

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

*Cite as 2025 VI Super 27*

sent an email as late as June 7, 2018, advising Cutrona that the Management Company was not aware of a tax bill on CU-1. After the hurricanes struck the Territory, Management diverted their attention and resources to hurricane recovery efforts and did not provide a response to NA until several months later. (*Trial Tr. Vol. 3, p. 119, September 13, 2023*). NA then sought assistance of its counsel, and it is only upon counsel's inquiries that the Tax Assessor realized that a separate tax bill was not generated for CU-1 and neither was CU-1 ever assigned a parcel number. The Tax Assessor, in his discretion, chose not to levy any delinquent fees, but chose to collect a tax in the amount of $7,305.[29] The taxes were retroactively assessed to 2008, issued on March 1, 2018, and were paid on March 5, 2018, for the period 2008 to 2017.

¶59 Now, although there is a recorded deed at the Office of the Lieutenant Governor, Great Bay's treasurer testified they have not received a tax bill for CU-1 since 2017 and neither have they paid any property taxes since 2018 (*Trial Tr. Vol. 2, p. 189, September 12, 2023*). NA is also unaware of a tax assessment since they conveyed the deed in 2017. This signifies that the government may not have added CU-1 to the tax roll as required by § 2413, or has decided to cancel such assessment and eliminated CU-1 from the tax roll. In any event, this shows there was a one-time payment on March 5, 2018, and NA could not be held responsible for such an obligation at the time of the deed transfer on September 20, 2017.

---

[29] *See* Title 33 V.I.C. § 2413. The tax assessor learned of the escape from tax assessment and immediately assessed CU-1 and although as required by this statute to add surcharges, the assessor chose not to do so.

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

*Cite as* 2025 VI Super 27

Neither the government nor the Management Company who handles all the finances for NA was able to speak informatively on the outstanding taxes. Thus, at the time of the deed transfer, there were no pre-existing tax obligations and NA should not be held accountable for a non-existent obligation.

¶60　Great Bay further argues that at the time of the deed transfer, the lease operating agreement with the restaurant, RG101, the company contracted to provide food and beverage service at CU-1 was terminated without their knowledge. Cutrona testified NA terminated the agreement prior to September 2017.[30] Great Bay argued they were not notified of the termination beforehand. Great Bay offered no documentary evidence that reflects that NA was required to notify Great Bay that they were going to terminate the service contract with RG 101, and even if there were such a provision the effective date of termination of the restaurant lease agreement was August 31, 2017, three weeks before the deed transfer.[31] The only requirements under the governing documents are that there be no obligations or service contracts at the time of the transfer and there were none.

¶61　Great Bay attempted to add another hurdle for NA to cross by arguing there was need for unanimous consent of the NA members. NA's Bylaws require a vote to convey, and they obtained a majority of 81% of eligible voters, but, nevertheless, the Fourth Amendment was controlling the document. Thus, irrespective of Great

---

[30] Trial Tr. Vol. 5, p. 122-123, September 15, 2023

[31] The restaurant tenant executed the termination on September 22, 2017, but made it retroactive prior to the deed transfer. (*Ex. 84, Trial Tr. Vol. 2, p. 42, September 12, 2023*)

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

*Cite as* 2025 VI Super 27

Bay's position on lack of a unanimous vote, the Fourth Amendment permitted the single commercial unit owner, NA, with the authority to deed the unit to Great Bay Association without the Association's consent.

¶62 Great Bay also argued the Management Company was working in conjunction with NA to surreptitiously transfer CU-1 to Great Bay, without Great Bay's consent and without money. However, the meeting minutes and extensive email communications otherwise shed a different light. First, the Management Company has several representatives including guests that appear at every meeting. Representatives are present on behalf of The Ritz-Carlton Hotel Company, LLC and The Ritz-Carlton Management Company. Various representatives appear at any given meeting in both associations' board meetings. Thus, the Management Company is privy to all decisions that are made by the boards. Moreover, the Management Company officials are tasked with numerous responsibilities in handling all business affairs, preparation of audits, and accounting for both associations in addition to managing all assets.[32]

¶63 Now, as referenced earlier, Great Bay meeting minutes dating back to April 8, 2015, reflect that a proposal for the transfer of CU-1, *inter alia*, was submitted to Great Bay, but not accepted at that time due to many concerns that went unanswered at the board meeting. Also, Great Bay steadfastly maintained the position that NA members would still be responsible for their assessments towards

---

[32] Preliminary Injunction hearing Trans. p. 15, Dec. 13, 2021; Trial Tr. Vol. 3, p. 316, September 13, 2023.

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

*Cite as* 2025 VI Super 27

CU-1. There was no evidence that the Management Company was working in tandem with NA to the detriment of Great Bay. *Nota bene*, during that same board meeting "[t]he Management Company indicated that they would support whatever a majority of the Membership wanted, but added that the Management Company took no position on the proposal itself." (*See Ex. 1 Board of Directors Meeting Minutes, April 8, 2015*)[33]. "The Ritz-Carlton Management Company, as manager of both Associations, will not take part in settlement discussions." (*See Ex. 14, Board of Directors Meeting Minutes, November 30, 2017*). "The Ritz-Carlton Management Company recommended a mediator be brought into the discussions between the two Associations." *Id.* Again, it is quite evident the Management Company emphasized their lack of interest in getting involved in the dispute.

¶64 Moreover, despite Great Bay's claim that the Management Company worked secretly against them, Great Bay did not present even a scintilla of evidence to support this contention.[34] The uncontroverted testimony shows that the Management Company, at all times, remained neutral.[35] Furthermore, in an effort

---

[33] A motion was made by Mr. O'Brien to reject The Neighborhood Association's proposal to transfer the Commercial Unit Deed for Grand Palazzo Club to Great Bay Condominium Owners Association. The motion was seconded by Mr. Thomas Doyle and passed 4-0.

[34] Treasurer Doyle, Jr. testified, "[t]he management company has no incentive to watch expenses because the management company's compensation is a percentage of what we [Great Bay] spend. So the more I spend, the more they pay, the more they get." *Trial Tr. Vol. 1, p. 100, September 11, 2023)*. This testimony discredits Great Bay's argument that the Management Company was secretively working with NA to transfer the deed to CU-1, which has less money in their budget.

[35] *See* for example, email dated November 4, 2021, sent from Marsha Leighton-Herrmann directed to an NA suite owner advising the owner the additional bill (CU-1assessement) she received was sent by Great Bay Association Board and although Ms. Herrmann was aware that it was sent but it is not being handled by the management company and the site team cannot provide any guidance or input. Stephanie Sobeck insisted upon board approval or an UWC prior to honoring Great Bay's request to assess the 2017 maintenance fees. *See* Ex. 68.

to protect the Management Company from getting involved in this dispute between Great Bay and NA, the Management Company urged Great Bay to sign an Unanimous Written Consent (UWC) after Great Bay requested the Management Company issue the 2017 assessments against NA and the Management Company refused because it was not included in Great Bay budget. (*Trial Tr. Vol 4, p. 100, September 14, 2023*). On October 2016, Great Bay passed the 2017 budget without assessments on CU-1. Even the MVC TOA although possessing a 49% share in CU-1, refrained from taking a side in this dispute.

¶65 On November 24, 2017, Great Bay transmitted a revised version of the proposed UWC between Great Bay and NA to the Management Company. After the budget was passed, Great Bay rejected the Management Company's version and transmitted a revised version to them. The pertinent language in Great Bay's version reads as follows:

> "Whereas, after the budget was passed, the Association and NA were in discussions about the possible turnover of CU-1 to the Association, and therefore the payment of the Maintenance fee was postponed"; and

> "Whereas, the association and NA made numerous attempts to negotiate acceptable terms and conditions for the transfer of the CU-1 unit, but the parties were never able to agree to mutually agreeable terms"; and

> "Whereas, the association advised NA that it would collect a previously assessed 2017 maintenance fee on the CU-1 if the acceptable terms were not reached"; and

> "Whereas, no agreement was reached in connection with the contemplated transfer of CU-1 to the GBCOA, and NA was in control of CU-1 for the entire 2017 club year that the club was operating, including but not limited to signing a lease termination agreement with the operator of GPC,

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

Cite as 2025 VI Super 27

without discussion or notice to the Board." (*Trial Tr. Vol. 2, pp.38-39, September 12, 2023*)

¶66    Great Bay specifically demanded the payment of $159,085 from NA. By this time, the hurricanes had already passed and Great Bay's access agreements had expired. This demonstrates Great Bay's ardent attempts to collect the maintenance fee, post-budget approval, due to their frustration of becoming responsible for CU-1 without any additional funding to do so. The UWC also shows the Management Company took extra measures to protect itself and to remain neutral in the dispute.

¶67    Throughout the negotiation process there were extensive discussions between John Doyle[36] and Salvatore M. Cutrona, Sr. each on behalf of their respective boards with numerous emails being transmitted between the parties. Cutrona and NA secretary, Mark Betesh attended Great Bay's November 7, 2016, board meeting to once again propose the transfer of CU-1 to Great Bay, and suggested dates of transfer during 2017. Two of those tentative dates were January 1, 2017, with the most attractive date of April 2017, right after the high season ended. At the same time, Great Bay and NA were still trying to settle the 2012 lawsuit between them and the contractors regarding CU-1. There was no further communication until July 24, 2017, when Cutrona sent Draft no. 5 Deed Transfer Agreement and Draft

---

[36] John Doyle, former president of Great Bay, was succeeded by Abigail Chung, and as of December 2022, Thomas J. Doyle, Sr.

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

*Cite as* 2025 VI Super 27

no. 5A Deed, by email to Thomas J. Doyle, Jr. Great Bay's treasurer.[37] Although

identified as the fifth draft, this was the first written draft that the evidence shows

Great Bay received. There were several conditions within that proposed transfer

agreement including NA's offer to turn over their reserves. However, the agreement

was never executed and NA decided not to transfer their reserves with the deed.

¶68 From November 2016[38] through September 19, 2017, NA was solely

responsible for the GPC, after Hurricane Irma struck the Virgin Islands on

September 6, 2017.[39] (*Trial Tr. Vol. 2, p. 40, September 12, 2023*). In this deed

transfer agreement, NA purposely omitted any mention of settlement funds.

¶69 On August 16, 2016, Marsha Leighton-Herrmann attended NA's board

meeting on behalf of the Management Company and presented three scenarios for

the proposed 2017 budget plan:

> *Scenario 1* represented the status quo which means CU-1 stays with NA
> and the maintenance fees would be included in the budget. The total budget for
> CU-1 would be $270,346 and prorated at $939 per resident interest. Access fees
> for Great Bay at the GPC would be included in the budget.

> *Scenario 2* represented that NA would remain in existence and to dissolve
> after the completion of settlement negotiations of the code violation case; and CU-1
> deed would be transferred to Great Bay. The total budget would be $74, 809 which
> is prorated at $260 per resident interest. Access fees for Great Bay at the GPC

---

[37] Thomas J. Doyle, Sr. served as the treasurer of Great Bay but was elected president in December 2022. *See Trial Tr. Vol. 3, p. 83, September 11, 2023). See also* Ex. 74 in reference to the July 24th email to Doyle and Michael Gick.

[38] Great Bay members no longer had access to the GPC because the Second Amended Residence Owners Agreement had expired and was not renewed.

[39] The U.S. Virgin Islands experienced two Category 5 storms, Hurricanes Irma and Maria, on September 6, and September 20, 2017, respectively. *See* National Oceanic and Atmospheric Administration and National Weather Service, "National Hurricane Center Tropical Cyclone Report: Hurricane Irma" published on September 21, 2021, at 25, and National Hurricane Center Tropical Cyclone Report: Hurricane Maria" published on February 14, 2019, at 30.

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

Cite as 2025 VI Super 27

would be excluded in the budget.

*Scenario 3* represented that NA would remain in existence for approximately 2 months in 2017 to oversee the transfer of CU-1 to Great Bay. The total budget would be $95, 214 and prorated at $331 per resident interest.[40]

¶70     Based on the developments over the ensuing months, Great Bay was favorably inclined to accept CU-1. The following year, on August 15, 2017, Marsha Leighton-Herrmann once again presented two budget plans: Plan A, which includes CU-1 being transferred to Great Bay and Plan B which includes CU-1 staying with NA.   On that day, Great Bay agreed to a modified version of Plan A with the expectation that in addition they would receive NA's reserves. *(Trial Tr. Vol. 2, pp. 52, 62 September 12, 2023)*.   However, on August 16, 2017, the second day of the annual 2-day budget meeting, the Board reversed that decision and decided to adopt Plan B, which means CU-1 would stay with NA. In this budget, $160,000 of assessments was reflected under CU-1 which represents the CU-1 share. Great Bay decided to reject the transfer of CU-1 unless NA transferred the reserves and settlement proceeds from the litigation and both associations will jointly decide how to use the settlement funds.[41] Great Bay further set a deadline of Nov. 1, 2017, to receive the reserves, 2018 maintenance fees, and any other associated fees, and if not received, they will not accept CU-1.[42]

¶71 Despite this decision, negotiations continued. At this time, however, John

---

[40] *See* Ex. 21, Minutes from NA's board meeting held on August 16, 2016.  After the two-month transition period the NA corporation would dissolve.

[41] See Ex. 12.

[42] *Id.*

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

*Cite as* 2025 VI Super 27

Doyle appointed Abigail Chung and Michael Gick to serve as contact people to spearhead the anticipated negotiations and bring the deed transfer discussions to closure. On September 6, 2017, Hurricane Irma struck the Virgin Islands. By this time, NA has transmitted draft Deed No. 6, but still with no money offered. On September 10, 2017, Cutrona sent an email to Chung and Tom Doyle in response to their email informing them of the NA board sending them the deed and deed transfer agreement and their intent to liquidate NA and dissolve the corporate structure as there was no purpose for the existence of NA, and their intent to transfer $21,990 in reserves. Great Bay recommended NA not to dissolve. On September 11, 2017, Abigail Chung wrote to Cutrona advising him that they were willing to accept the deed to CU-1, on the condition that the takeback provision would be removed and reserves based on the Armstrong Reserve Study, (approximately $159,000) and all the remaining settlement monies, less legal fees would be transferred with CU-1. In other words, all the settlement funds remaining after the refurbishment would be transferred with the deed because Great Bay would now be responsible for the maintenance and upkeep of the Grand Palazzo Club. Cutrona responded the same day and advised Chung that the NA board will discuss the takeback provision.

¶72 NA wanted to be able to take back CU-1 if Great Bay converted it to something other than a restaurant and lounge, however, when prompted, NA agreed to remove that restriction upon Great Bay. Yet, although NA agreed to remove the takeback provision, they refused to transfer any of their funds. After

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

Cite as 2025 VI Super 27

further negotiations, the two associations never came to an agreement regarding CU-1.

¶73 Between November 17, 2017, and November 22, 2017, there were communications between Stephanie Sobeck and both John Doyle and Thomas Doyle regarding 2017 CU-1 maintenance fees. The Management Company aware of the disagreement on the conveyance of CU-1, insisted upon either a written board approval or an UWC for them to be instructed on the billing of CU-1.[43]

¶74 During these negotiations, NA requested the use of the GPC for meetings. Abigail Chung testified that Great Bay has held several dinners with private chefs and other events at the GPC since 2017 and has excluded NA from any use of the lounge.[44] Cutrona testified NA requested to hold an annual Board meeting in the lounge which was denied[45] and since September 20, 2017, Great Bay has outright rejected any use of common space within the condominium, including the Grand Palazzo Club, members' reception area, and members' lounge.[46] Great Bay's exclusive use of CU-1 cancels out any expectation that NA members should pay in excess of $160,000 per year in maintenance fees for a unit they are not authorized to use because of failed negotiations over the transfer of CU-1.

¶75 On November 30, 2017, Great Bay board convened a meeting and remained firm in not accepting the deed without money. The settlement funds mentioned

---

[43] Ex. 68
[44] P.I. Hearing Transcript p.75, lines 4-13,22-25, December 13, 2021
[45] P. I. Hearing Transcript p.76, lines 1-3, December 13, 2021
[46] P. I. Hearing Transcript p. 119, lines 1-24, December 8, 2021

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

Cite as 2025 VI Super 27

earlier derive from the joint effort between Great Bay and NA bringing an action against the Developer and others. The settlement negotiations resulted in a substantial amount of money being paid out over a period of months in three settlement tranches. The first settlement occurred during April or May 2013, and those proceeds were used to renovate CU-1 to the GPC. The second set of funds came in January 2017 and the third set in June 2017.[47] Regarding the second set of settlement proceeds, Great Bay, through president J. Doyle, agreed to tender those funds to NA, and are currently in NA's possession. The last settlement remains in an escrow account controlled by NA until the parties can decide how those funds are to be distributed.

¶76 It is important to state, however, that in addition to settlement proceeds NA received, NA members contributed an exorbitant amount of funds from their membership dues to help refurbish CU-1 to the GPC. Cutrona testified that NA's board believed they had a fiduciary responsibility to remit back the extra assessments NA members put in to finalize the completion of the GPC. (*Trial Tr. Vol. 3, p. 157, September 13, 2023*). However, those escrowed funds are the same monies that Great Bay is demanding, less attorney's fees, in addition to the reserves.[48] Despite these demands, Great Bay admitted they received and kept all

---

[47] Trial Tr. Vol. 2, pp. 361, 362, September 12, 2023.
[48] On December 14, 2017, Stephanie Sobeck, Vice-President of Asset Management, RC St. Thomas, advised both associations that she received authorization from the president of Great Bay, John Doyle, to disburse a portion of the proceeds from the second settlement to reimburse NA for their legal fees. The remaining portion of this settlement was reserved in NA's escrow account until she receives joint notice from both boards as to how to proceed with the disbursement of the remaining funds. This is yet another example of RC St. Thomas remaining neutral in this dispute.

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

Cite as 2025 VI Super 27

the insurance proceeds from the hurricane claims for CU-1. *(Trial Tr. Vol. 2, pp. 168-169, September 12, 2023).*

¶77 Given these claims and arguments Great Bay has set forth, NA, to the contrary, strongly disputes that RC Hotels intended for NA to exist in perpetuity for the sole purpose of maintaining CU-1. They posit it was initially obligated to accept CU-1 as stated in the Declaration. The Declarant was preparing to convey CU-1, at some point in the future, upon NA for the sole purpose of NA's use and Declarant authorized the conveyance without consent from the grantee. NA is correct in its analysis that they had the express authority to convey the deed and Great Bay's consent was not necessary. Their interpretation of the Fourth Amendment language is "an owner of a Commercial Unit" which NA became the owner under the Fifth Amendment, "may also convey a Commercial Unit", hence CU-1, to the "Association" which, in this instance has to be Great Bay because, needless to say, NA does not need to convey CU-1 back to themselves as they were already the owner of CU-1 and therefore can convey it to another, and in this instance, Great Bay-without Great Bay's consent. They assert it is Great Bay's interpretation of the term "association" that has been misconstrued. A reading of the pertinent provisions of the Fourth Amendment reflects:

> Neighborhood Association shall refer to that certain U.S. Virgin Islands not-for-profit corporation to be organized for the purpose of owning Commercial Unit CU-1, the commercial use of which is intended to include the delivery of food and beverage service to the occupants of two-bedroom suite residences in Phase 5 and Phase 6 of the Condominium.

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

*Cite as* 2025 VI Super 27

Here, the term "association" undoubtedly refers to NA. This first paragraph under section 5 of the Fourth Amendment contains the Declarant's definitions of a "unit" and a "commercial unit" which directly precedes and is related to the NA. The Developer created only one commercial unit and Great Bay's application of the term "Association" as referred to in that portion of the Fourth Amendment to the other paragraphs under section 5 is faulty because it would read incoherently in the four succeeding paragraphs, as follows:

> The Neighborhood Association, as the Owner, may also convey CU-1, or any portion of CU-1, to the Neighborhood Association for no or nominal consideration without the consent of the Neighborhood Association and the Neighborhood Association shall be obligated to accept such conveyance.

While under the Fourth Amendment it was the initial intent of the Declarant to create CU-1 for the delivery and food beverage service to accommodate the occupants in the two-bedroom suites, the same Declarant granted NA the authority to convey CU-1 under NA's own bylaws.

¶78 Therefore, the following four paragraphs referenced each owner of a commercial unit being "Members of the Condominium Association" which in this context refers to Great Bay. Plaintiff's interpretation would imply that the Owner, who at the time was NA by virtue of this Amendment, would be able to convey the unit they already own back to themselves without consent. This argument completely undermines the plain reading of the succeeding paragraphs where it mentions "Members of Condominium Association", "Members Association",

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

Cite as 2025 VI Super 27

"Condominium Association", and "Association" interchangeably, meaning Great Bay, fourteen times throughout the remaining paragraphs under section 5. It also undermines the reading of the Declaration and the subsequent Fifth Amendment. Each association has its own set of bylaws that were approved by the Board of Directors and a majority of association members who are eligible to vote. A thorough reading of the Declaration, the Supplementary Declaration, and their amendments, all lead to the same result. Great Bay is referred to as the "Condominium Association", the "Association," and the "Members Association," whereas NA is exclusively referred to as the "Neighborhood Association" or "Members of the Neighborhood Association" and the Declaration first defined the Members Association as Great Bay.

¶79   Within its own Bylaws and Articles of Incorporation, NA referred to itself as the "Association" and "Members Association". When considering the text of the documents as a whole and the objective intent of the parties, it can be reasonably interpreted that the general "Association" referred to in each document can only mean the association as defined in that particular document, unless specified otherwise. Under the plain meaning of the Declaration and evidenced by Great Bay's Articles of Incorporation, the Developer's intent was to explicitly refer to Great Bay as the "Association" or "Members Association" and NA as the Neighborhood Association throughout the Declaration and Supplementary Declaration, thus the Court can conclude that the Association in this paragraph of the Fourth Amendment is referring to Great Bay.

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

*Cite as 2025 VI Super 27*

### iv. Ratification Agreement

¶80     During the course of renovating CU-1 to the GPC, Great Bay and NA agreed to enter into a ratification agreement which was not executed until May 30, 2014, five months after the grand opening of the GPC in December 2013. The purpose of the ratification agreement was for NA to have Great Bay's post-construction approval of the necessary renovations after the settlement of the code violation cases. The ratification agreement was created to formalize all the changes that had been made due to prior approval of the work in July 2013; Great Bay did not know the extent of all the changes that need[ed] to be made that became known as the project progressed.[49] Over two million dollars in renovations was spent to bring CU-1 to code and because Great Bay was responsible for the upkeep and maintenance of the common areas, it was necessary to obtain Great Bay's approval.

¶81   The ratification agreement is two-fold: 1.) to confirm GBCOA's acceptance of the improvements made to the suites lounge to the common areas while NA also agreed to be responsible for the maintenance and upkeep of CU-1; and 2.) to ensure that if the MVC TOA or any single entity or person within NA ever gained more than 33% of the suite interests and intended to overtake NA, the agreement would be implemented, thus securing Great Bay's presence in the operations of NA. This ratification agreement provides an extensive list of the scope of work that

---

[49] Trial Tr. Vol. 1, p. 225, September 11, 2023

affected the common areas. NA was responsible for the sole cost of construction. Both Cutrona and Thomas Doyle testified they wanted a level of protection because both associations had a good working relationship with each other and were skeptical in the event a third-party gained more control over NA.[50] Both Great Bay and NA wanted to maintain their neighborly relationship. Great Bay would, at that time, demand either the money used for the upgrades in excess of $2 million be paid back to Great Bay or revert the Suites Lounge back to its condition prior to the improvements.

¶82    The Ritz-Carlton had an agreement to purchase unsold condominium units or repossess delinquent units and transfer them to the inventory of the MVC Trust.[51] Of the 288 fractional interests that belong to NA, forty-nine percent (49%) are owned by The Ritz-Carlton and the MVC TOA. The remaining fifty-one percent (51%) consists of individual owners and the 12 interests vested in CU-1.[52]

¶83    The MVC TOA would then advertise those units for sale. The pivotal concern is that MVC Trust inventory exceeded 33% in 2015, some four years before Great Bay attempted to invoke the Ratification Agreement. The salient provision in the Ratification Agreement is found in paragraph 7, which provides:

> In the event that any person or entity, either directly or indirectly, acquires more than 33% of the voting interest in NA, or in the event that the majority of members of the NA Board of Directors is not made

---

[50] Trial Tr. Vol. 2, p. 162, September 12, 2023; Trial Tr. Vol 1, p. 229, September 11, 2023; Trial Tr. Vol.5, pp.152-155, September 15, 2023.

[51] Trial Tr. Vol. 1, pp. 89-92, September 11, 2023. Purchase agreement was entered into on March 13, 2014, between RC St. Thomas and MVC TOA. *See* Trial Tr. Vol. 2, p. 288, September 12, 2023.

[52] *See* Plaintiff's Ex. PI 2- Motion to Dissolve or Modify Temporary Restraining Order at 2.

up of members who independently own their Residence Interests, then GBCOA may, in its sole discretion, withdraw this ratification and this agreement shall become null and void and of no legal effect. In the event that GBCOA elects to terminate this agreement, then NA agrees at its sole cost and expense, to restore the premises to its condition before the work referenced herein was undertaken, or pay to GBCOA an amount equal to the cost of said restoration. In that event NA further covenants and agrees that it will undertake no work, maintenance, repairs, or alterations to any of the common areas or limited common areas of Gardenia Building, specifically including the common areas and limited areas on the fifth floor of Gardenia Building, without express written consent of GBCOA.

¶84 NA and MVC Trust's relationship remained cordial and Great Bay never made a demand on the ratification agreement until 2019. Great Bay retained the right to insist that once the suite owners exceeded 33% by a single entity, they would demand NA remove all the improvements or pay Great Bay the value of those improvements. Two years after the deed was conveyed, Treasurer Doyle, demanded the sum of $687,500.

¶85 The ratification agreement effectively rendered NA powerless and placed all the power with Great Bay. These two options placed a stranglehold on NA. They either pay Great Bay in excess of $600,000, as demanded, or destroy all its upgrades in CU-1. It is incomprehensible and wasteful to destroy the upgrades and revert to the original CU-1 lounge. Thus, the only logical choice would be to pay back Great Bay the money used for the upgrades. Adhesion contracts are not *per se* unenforceable, but a court may decline to enforce them if they are found to be unconscionable. *Vitale v. Schering-Plough Corp.*, 231 N.J. 234, 174 A. 3d at 980 *(2017)*. To determine whether a contract of adhesion is so oppressive or

inconsistent with public policy that it would be unconscionable to enforce the contract, courts consider four factors: (1) the subject matter of the contract; (2) the parties' relative bargaining positions; (3) the degree of economic compulsion motivating the adhering party; and (4) the public interests affected by the contract. *Block v. Jaguar Land Rover N. Am, LLC.,* 2023 U.S. App. LEXIS 13507, 2023 WL 3750594. The court finds the demand clause of the ratification agreement unconscionable. Even though the Court finds the original purpose of the ratification agreement started with good intentions as many of the discussions regarding the renovations remained between Cutrona and John Doyle, the Court finds the options to be unconscionable and unenforceable. The $2 million worth of upgrades came from both settlement proceeds and assessments of NA members which required the joint legal effort of Great Bay and NA. It became an unenforceable option when they agreed to restore CU-1 to its prior condition, if the MVC Trust exceeds 33% interest, which it has. The illogical enforceability brings CU-1 back to Virgin Islands code-violated conditions and is really an attempt by Great Bay not to physically restore CU-1 to its prior condition, but to demand an exorbitant amount of money from the smaller association. The value of the GPC is not lost on Great Bay because they have benefitted from the use of this $4 million[53] investment and now possess, in its portfolio, a valuable asset they did not purchase.

---

[53] The Management Company valued CU-1 at $2 million when it was conveyed to NA in 2008. *See* Trial Tr. Vol. 2, pp. 289-292, September 12, 2023.

¶86    Now that the MVC Trust currently holds 49% of the suites interest which represents approximately 141 members of the 288 NA members, Great Bay is asserting that NA should tender those funds.    There is no provision in the Declaration or its Amendments to support such a demand. Consequently, the ratification agreement is yet another instrument written in contravention to the Declaration and the Amendments which leads to an unconscionable outcome. Further, the Court can not glean from the testimony of Jeff Comfort, president of the MVC TOA, that the relations between MVC TOA and NA are strained or acrimonious, as they too have refrained from getting involved in this dispute.

### B. Conclusions of Law

¶87    The controlling documents in this matter are the Declarations and the relevant Third, Fourth, and Fifth Amendments. The authority to convey the only commercial unit on the premises is rooted in the Fourth Amendment to the Declaration. The Declarant unequivocally stated the development of The Ritz-Carlton property would be done in phases and the Declaration and Supplementary Declaration would be amended from time to time. Each amendment offered bylaws, newly constructed buildings, and divided residence interests into fractional shares.

¶88    Despite presentations to Great Bay's board and continued negotiations, NA exercised its inherent authority to convey CU-1 without any outstanding obligations as prohibited by the Amendments. Great Bay failed to prove any violation of the Amendments as there were no assessments due and owing at the time of the transfer. Assessments could not have become due on November 1,

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

Cite as 2025 VI Super 27

2017, as the transfer had already occurred. The restaurant contract was terminated almost one month prior to the deed transfer and there were no outstanding property taxes because the government never designated a parcel number, consequently taxes were never assessed directly upon the single commercial unit of the condominium complex, and neither was NA obligated to turn over their reserves.

¶89    In 2008, NA was deeded a space and five years later, they renovated and upgraded it. When the GPC became unrestricted, NA owned the GPC. For three consecutive years, Great Bay entered into formal written agreements with NA for access to the GPC. These three residence owners' agreements were not permitted by the Declarations because they violated the exclusivity clause in favor of NA members and their guests. Nonetheless, the parties entered into the agreements. During the third year of those agreements, the parties began negotiations. Even if NA thought the CU-1 was financially burdensome for NA's members, or that this second assessment would depress the market value of the units, or for whatever undisclosed reason NA entered into negotiations, the deed transfer was not improper or violative of any statute or any provision of the governing documents. Great Bay entered full-blown negotiations for the acceptance of the CU-1 with certain monetary conditions, therefore, had NA complied with those demands, Great Bay probably would not have brought this suit. Yet, Great Bay argues the covenants run with the land in perpetuity irrespective of who owns CU-1. There is no provision in the governing documents that requires NA to surrender its funds or

reserves. Therefore, NA did not violate any of the provisions of the Declaration, Supplementary Declaration, or Amendments.

¶90    As a result of the failed negotiations and NA's strong stance on not turning over any money, Great Bay rejected the deed and tried to enforce their demands by passing a motion in November 2017, whereby NA would be deemed delinquent on December 13, 2017, if the annual assessments on CU-1 were not paid. In spite of all the arguments raised, none justifies the cancellation of the deed. NA's failure to consummate the deed transfer agreement was not violative of any governing provision. The only conditions for conveyance require that CU-1 must be free and clear of encumbrances and contracts and after conveyance. The Court does not find there was any fraudulent or untoward conduct surrounding the conveyance of the deed.

¶91   Hence, when the assessments were issued in October 2021, NA did not have exclusive control of CU-1, neither were they legally responsible for the operation or upkeep of CU-1 because a valid deed was conveyed four years earlier in 2017. The language in the governing documents is not subject to multiple interpretations. Paragraph 5 of the Fourth Amendment unequivocally states in its respective part:

> The Declarant or an Owner of a Commercial Unit may also convey a Commercial Unit, or any subdivision thereof in the case of Declarant, to the Association for no or nominal consideration without the consent of any other Owner or the Association, and *the Association shall be obligated to accept conveyance.*" A Commercial Unit will only be transferred to the Association free of service contracts or other obligations other than as provided in the Declaration, By-laws and Rules and Regulations, all as amended from time to time.

*Great Bay Condominium Owners Ass'n, Inc. v. The Neighborhood Ass'n, Inc.*
*Case No. ST-2018-CV-768*
*Memorandum Opinion*

*Cite as* 2025 VI Super 27

¶92    It is inequitable to assess current owners and new potential owners of suite interests in Buildings G and H for the responsibility for CU-1, when Great Bay uses CU-1 to the exclusion of NA.  Since 2017, Great Bay has had control over CU-1. Rejection of the deed would be violative of the Fourth Amendment.

¶93    For NA to be held solely responsible would be a violation of Title 28 V.I. C. § 909 which provides, "the common profits of the property shall be distributed among, and the common expenses shall be charged to, the apartment owners according to the percentage of the undivided interest in the common areas and facilities." Therefore, as of September 20, 2017, Great Bay Condominium Owners Association became the rightful owner of CU-1, henceforth, all 1,260 members of Great Bay are responsible for the payment of assessments which shall be distributed in the proportionate share amongst all 1,260 club members. A Declaratory Judgment of even date follows.

Date: July 31 2025

**RENÉE GUMBS CARTY**
Senior Sitting Judge
Superior Court of the Virgin Islands

**ATTEST:**
**Tamara Charles**
Clerk of the Court

By: _____
**Donna D. Donovan**
Court Clerk Supervisor___08__/__01__/_2025_